# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

ERIE INSURANCE COMPANY,      )
     )
       *Plaintiff/Counter-Defendant*,    )
     )
v.      )
     )
CLAIRE RAUSER and CAROL RAUSER,    )
     )
       *Defendants/Counter-Plaintiffs*    )
     )
_____ )
     )
CLAIRE RAUSER and CAROL RAUSER,    )
     )
       *Third-Party Plaintiffs*,    )
     )
v.      )
     )
HITSON INSURANCE, INC., BRYAN    )
INSURANCE GROUP, INC., MATTHEW    )
BRYAN, and MICHELE SELF,    )
     )
       *Third-Party Defendants*.    )

Case No. 3:19-cv-375

Judge Travis R. McDonough

Magistrate Judge H. Bruce Guyton

---

## ORDER

---

Before the Court are: (1) Plaintiff and Counter-Defendant Erie Insurance Company's

("Erie") motion to exclude experts Daryll Martin and Brent Blalock (Doc. 89) and motion for

summary judgment (Doc. 100); (2) Defendants, Counter-Plaintiffs, and Third-Party Plaintiffs

Claire and Carol Rauser's ("the Rausers") motion for summary judgment (Doc. 102); and (3)

Third-Party Defendants Hitson Insurance, Inc., Bryan Insurance Group, Inc., Matthew Bryan,

and Michele Self's (collectively, "Hitson") motion for summary judgment (Doc. 98). For the

following reasons, the Court will **GRANT IN PART** and **DENY IN PART** Erie's motion to

exclude Daryll Martin and Brent Blalock (Doc. 89) and will **GRANT IN PART** and **DENY IN PART** its motion for summary judgment (Doc. 100). The Court will **DENY** the Rausers' motion for summary judgment (Doc. 102) and will **GRANT IN PART** and **DENY IN PART** Hitson's motion for summary judgment (Doc. 98).

I.     **BACKGROUND**

The heart of this litigation lies in a dispute over amounts allegedly owed to the Rausers under an ErieSecure Home insurance policy (the "Policy"), covering the Rausers' residential property located at 5097 Allegheny Cove Way in Maryville, Tennessee ("the Property"). (Doc. 104, at 104–135, 260.)

**A. The Rausers' Acquisition of the Erie Policy Through Hitson**

The Rausers purchased the Property sometime in 2014 or 2015 and broke ground on their house sometime in 2015 or 2016. (*Id.* at 45.) The building permit was issued in February 2016, and construction commenced shortly thereafter. (*Id.* at 2–3.) Mr. Rauser approached Defendant Matthew Bryan at Hitson, Erie's agent, about coverage for the house. (*Id.* at 15, 57, 414–15.) According to Mr. Rauser, he approached Hitson because he realized he needed to obtain additional builders' risk insurance coverage to insure against the risk of loss of the partially built home. (*Id.* at 52–53.) After answering general questions from Mr. Rauser, Mr. Bryan directed him to Defendant Michele Self, a personal-lines manager for Hitson. (*Id.* at 15, 229.) Ms. Self recommended that Mr. Rauser obtain a builder's risk policy that would convert into a homeowner's insurance policy upon completion of construction. (Doc. 116-1, at 23, 41; Doc. 104, at 312.)

On February 2, 2017, after speaking to Mr. Rauser by phone, Ms. Self emailed him a blank form for an insurance quote. (Doc. 104, at 89, 229–30.) Four days later, Mr. Rauser

returned the completed form, in which he estimated the value of the home as $2,000,000 and estimated the size of the dwelling as approximately 8,000 square feet plus attic space. (*Id.* at 77–78, 231–232.) Hitson then provided Mr. Rauser with a quote for an ErieSecure Home policy. (*Id.* at 81–82.)

On March 13, 2017, Mr. Rauser signed an "ErieSecure Home Application," which included "guaranteed replacement cost" coverage with Erie. (*Id.* at 82, 233–35.) In the space provided for "Amount of Insurance: Dwelling," Mr. Rauser indicated $2,000,000. (*Id.* at 234.) Despite this response, he testified that, at the time he approached Hitson, he "expected that the house would go over the 2.4 [million] that was originally estimated for [him] at the inception of the project . . . nobody was expected to be able to finish that project at that point for that 2.4 million." (*Id.* at 70.) According to Mr. Rauser, the $2,000,000 figure was the "value of the build at that point" in time.[1] (*Id.* at 79–80.)

On the insurance application, Mr. Rauser also answered "No" to the question, "Is the dwelling at the indicated property location currently owned and occupied by you as your primary residence?" (*Id.*) When asked to provide details regarding his answer, Mr. Rauser stated "under construction." (*Id.*) On the application, Mr. Rauser stated that the Property was purchased in March 2017, and he answered "No" when asked if "[e]xcept for nonpayment of premium, has any company declined, cancelled, or refused to renew any similar insurance?" (*Id.*) Mr. Rauser signed the application, thereby indicating that he had "given true and complete answers to the questions in this application." (*Id.* at 235.)

---

[1] In August 2017, approximately six months after submitting the Erie insurance application, Mr. Rauser was interviewed by a reporter for the Wall Street Journal. In the interview, Mr. Rauser stated that the house he was constructing was 12,000 square feet and would cost close to $4,000,000 to complete. (Doc. 104, at 67–69.)

Erie then issued the Policy for an initial policy period of March 8, 2017, to March 8, 2018.  (*Id.* at 106.)  The Policy was renewed for the period of March 8, 2018, to March 8, 2019, and the Rausers received copies of the policies, although Mr. Rauser testified that he decided not to read the initial terms of the Policy, because he was "depending upon [his] agent" to provide him with the correct coverage and because he did not "expect there to be any changes from the original."  (*Id.* at 61–62.)  It is undisputed that the Rausers made all premium payments on the Policy.  (*See* Doc. 97, at 13; Doc. 104, at 156.)  Mr. Rauser did not have any relationship with Hitson prior to obtaining the Policy, and the only insurance policy Mr. Rauser has ever purchased through Hitson is the Policy.  (Doc. 104, at 83.)  Hitson did not charge Rauser to consult about the Policy, and Mr. Rauser testified that he did not consider Hitson to be his financial advisor.  (*Id.* at 83–84.)

### B.      Terms of the Policy

Under "Section I – Property Protection" of the Policy, the "amount of insurance" listed for the "Dwelling" is "Guaranteed Replacement Cost."  (*Id.* at 106.)  There is an asterisk next to "Guaranteed Replacement Cost," which ties the term to a note that "the amount of insurance applying to the dwelling is the replacement cost at the time of loss, subject to policy conditions and requirements.  The estimated replacement cost of the Dwelling is $2,000,000."[2]  (*Id.* at 106, 120.)  An additional page in the Policy entitled "IMPORTANT NOTICE REGARDING GUARANTEED REPLACEMENT COST" states that:

> Guaranteed Replacement Cost means the amount of insurance applying to your dwelling is the replacement cost at the time of loss *regardless of the estimated replacement cost of the dwelling shown on your Declaration*.  A covered loss to

---

[2] "Dwelling," while capitalized in some places but not in others within the Policy, is not a defined term within the Policy.

your dwelling will be settled on a replacement cost basis, without deduction for depreciation, subject to any policy conditions and requirements.

(*Id.* at 135 (emphasis added).)  This page further states that Guaranteed Replacement Cost may *not* be provided, however, if the insured "[fails] to notify [Erie] or [Hitson] of any improvements or other changes to the dwelling which exceed $5,000 within 90 days after such improvements or changes are started."  (*Id.*)  "Replacement cost" further means "in the case of loss or damage to buildings, the cost at the time of the loss to repair or replace the damaged property with new materials of like kind and quality for the same use at the described location."  (*Id.* at 111.)  The "insured location" in part means the "residence premises," which in turn means "the dwelling where '**you**' reside, including the structures and grounds, or that part of any other building where '**you**' reside which is shown as the '**residence premises**' on the '**Declarations**.'"  (*Id.* at 111–12 (emphasis in original).)  The location of the "residence premises" as shown on the Declaration is the 5097 Allegheny Cove Way address.  (*Id.* at 106.)

The Policy further states that Erie "will adjust the premium for the next policy to reflect any change in the 'replacement cost'."  (*Id.* at 120.)  However, under the Policy, the Rausers were obligated to notify Erie or Hitson "within 90 days of starting any improvements or additions which increase the 'replacement cost' value of [the Rausers'] Dwelling by $5,000 or more and pay any additional premium due. . . . If '**you**' [the Rausers] do not notify [Erie], [Erie does] not cover loss to such improvements or changes."  (*Id.* (emphasis in original).)  The terms of the Policy do not mention coverage for construction or builder's risk during construction of the home, aside from insuring against the loss of building equipment and construction materials. (*Id.* at 111.)

Finally, the Policy states that "[t]his entire policy is void as to [the Rausers] if, before or after a loss:  1. [The Rausers have] intentionally concealed or misrepresented any material fact or

circumstance concerning this insurance; 2. there has been fraud or false swearing by [the Rausers] as to any matter that relates to this insurance or the subject thereof; or 3. [the Rausers have] engaged in fraudulent conduct as to any matter that is related to this insurance or subject thereof.  In the event of Item 1., 2., or 3., [Erie] will not pay for any loss."  (*Id.* at 129.)

### C.      Completion of Construction at the Home

In December 2017, Mr. Rauser e-mailed Caitlin Cook, a personal-lines account manager at Hitson, and stated that he was hopeful construction of the home would be completed in May 2018.  (*Id.* at 236.)  On May 11, 2018, Ms. Cook reached out to Mr. Rauser inquiring whether construction was complete.  (*Id.* at 238–39.)  Mr. Rauser responded, "We are hoping and I said hoping for the end of June" 2018.  (*Id.*)  Ms. Cook replied, "Please let us know when the home is complete."  (*Id.* at 238.)

A certificate of occupancy issued for the Rausers' home on May 24, 2018, and the Rausers moved into the structure in July 2018.  (*Id.* at 323, 425.)  On July 26, 2018, Ms. Cook again emailed Mr. Rauser and asked whether the home was complete.  (*Id.* at 240.)  Mr. Rauser responded "[n]ot quite but very close" and told her to "ask again next week," but he also stated that the Rausers were presently living in the house.[3]  (*Id.* at 240, 410.)  On August 20, 2018, Ms. Cook again emailed Mr. Rauser, asking if the home was complete.  (*Id.* at 241.)  Mr. Rauser did not respond to Ms. Cook.  However, work continued on the home through 2018, and, on December 7, 2018, Mr. Rauser sent an email to his contractors setting out an extensive list of items that "need to be completed," "need to be finished," were "left unfinished," were "missing," and/or were "uninstalled."  (*Id.* at 109, 242–43.)  Mr. Rauser advised the contractors that he

---

[3] Although "dwelling" is not defined within the terms of the Policy, Erie underwriter Keith Doak testified that he "suspect[ed]" the Rausers' home would have become a "dwelling" "sometime in July 2018 or August 2018, when they moved into the home."  (Doc. 104, at 425.)

"expected completion" within thirty days but ultimately terminated construction on the home in January 2019, despite the requested items not being completed. (*Id.* at 5–10, 243.)

### D.     Erie and Hitson's Alleged Underwriting and Inspection Failures

Erie's home underwriting guidelines required that a cost estimator be completed with each new risk and with every change in a dwelling value on an existing risk to ensure that risk was accurately assessed. (Doc. 69, at 51.) A cost estimator was not reviewed during the underwriting process for the Rausers' home. (Doc. 104, at 362, 459). Additionally, Mr. Rauser testified that Ms. Self told him the home would be inspected once completed to ascertain its as-built value. (*Id*. at 441–42.) Erie never conducted an inspection.[4] (*Id.* at 361, 427, 441.)

### E.     The Fire and the Rausers' Insurance Claim

On March 3, 2019, an accidental fire occurred at the Property, resulting in a total loss of the home. (*Id.* at 252.) The Rausers subsequently made a claim to Erie for the replacement cost of their residence, seeking approximately $6,400,000. (Doc. 1, at 3.) Erie paid the Rausers $2,020,000.00 plus additional amounts for personal property, debris removal, and living expenses. (*Id.* at 3–5.) Erie cited to the "Notification of Improvements to Dwelling"[5] and "Concealment, Fraud, and Misrepresentation" portions of the Policy and informed the Rausers that their coverage could be limited under these provisions. (Doc. 104, at 368–75, 463–76.)

---

[4] In a post-loss claim note dated March 13, 2019, Erie's insurance adjuster noted: "I asked if [the inspector] looked at this property and he said they didn't. I asked why, and he indicated one of those that fell through the cracks." (Doc. 104, at 361.)

[5] The Rausers assert their home became a "dwelling in July 2018 when the Certificate of Occupancy was issued and Bryan was notified that the Rausers moved into the home." (Doc. 103, at 21.)

The Rausers' reconstruction cost expert, Brent Blalock, estimates the total reconstruction cost of the home is $5,919,440. (*Id*. at 322.)

### F.     The Parties' Claims

On September 26, 2019, Erie filed a declaratory-judgment action, seeking a declaration from the Court that it is not obligated to pay the Rausers additional amounts under the Policy. In its complaint, Erie alleges that the Rausers: (1) failed to notify Erie of improvements or additions to their home that increased the replacement cost, thereby voiding the Guaranteed Replacement Cost coverage of the Policy, and (2) intentionally concealed and/or materially misrepresented the size and value of their home to Erie, which increased Erie's risk of loss. (Doc. 1, at 6–7.)

After Erie initiated the declaratory-judgment action, the Rausers filed a counter-complaint against Erie and a third-party complaint against Hitson. (Doc. 97.) The Rausers assert claims against Erie for breach of contract, statutory bad faith, promissory estoppel/detrimental reliance, vicarious liability for the tortious actions of Hitson, and reformation of contract. (*Id.* at 24–33.) The Rausers also seek punitive damages on their breach-of-contract claim against Erie. (*Id.* at 27–28.) The Rausers also assert claims against Hitson for breach of contract based on failure to procure an appropriate insurance policy, failure to procure, negligence, negligent misrepresentation, tortious failure to procure, and breach of fiduciary duty. (*Id.* at 36–44.)

Erie has filed *Daubert* motions to exclude two of the Rausers' witnesses, Daryll Martin and Brent Blalock, and all parties moved for summary judgment. These motions are now ripe for review.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Law

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary

judgment.  *Celotex*, 477 U.S. at 323.

The standard of review when parties file cross-motions for summary judgment is the same as when only one party moves for summary judgment.  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).  When there are cross-motions for summary judgment, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id*.  In considering cross motions for summary judgment, the court is "not require[d] . . . to rule that no fact issue exists."  *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).

**B.**    **Analysis**

> ***i.  Erie's Declaratory-Judgment Claim Against the Rausers***

Erie argues that the Court should grant summary judgment on its declaratory-judgment claim and find that it is not required to pay the Rausers additional amounts under the Policy, because the Rausers made material and intentional misrepresentations on their insurance application, which increased Erie's risk of loss and voided the Policy.  (Doc. 101, at 3–11.)

Tennessee Code Annotated § 56-7-103 provides:

> No written or oral misrepresentation or warranty made in the negotiations of a contract or policy of insurance, or in the application for contract or policy of insurance, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

Under this statute, an insurance company can deny an insurance claim for benefits in two circumstances—"if the insured made intentional misrepresentations on the application for insurance or if the insured made misrepresentations that increased the insurer's risk of loss."[6]

_____

[6] Additionally, under the terms of the Policy, the Policy is void if the Rausers "intentionally concealed or misrepresented [a] material fact concerning [the Policy]," made a fraudulent or

*Smith v. Tenn. Farmers Life Reassurance Co.*, 210 S.W.3d 584, 589 (Tenn. Ct. App. 2006).

"[D]etermining whether an insured intentionally misrepresented information is a question of fact," but "determining whether a particular misrepresentation increases an insurance company's risk of loss is a question of law for the court."[7] *Id.*

When an insurer seeks to void an insurance contract based on an insured misrepresentation that increases its risk of loss, the burden is on the insurer to demonstrate that the insured's misrepresentation increased its risk of loss. *U.S. Specialty Ins. Co. v. Payne*, 387 F. Supp. 3d 853, 861 (E.D. Tenn. 2017). "[T]he element of 'misrepresentation' is 'distinct' from the element of 'increased risk of loss.'" *Id.* As a result, "the Court must first determine whether [the insured] made a misrepresentation, and second, whether that misrepresentation increased [the insurer's] risk of loss." *Id.*

"To determine whether a written or oral statement constitutes a misrepresentation, the court must first decide 'what the insurer asked, required, or expected the applicant to represent.'" *Id.* at 863 (citing *Gatlin v. World Service Life Ins. Co.*, 616 S.W.2d 606, 608 (Tenn. 1981)). "Where a question on an application is specific and unambiguous, it can be easily determined whether the answer is true or not." *Frank v. Nationwide Mut. Fire Ins. Co.*, No. 3:04cv0025, 2006 WL 861392, at *4 (M.D. Tenn. Mar. 28, 2006). Conversely, "where a question on an application is broad and ambiguous, it is a question of fact whether the answer given to the question was true or false." *Payne*, 387 F. Supp. 3d at 861. Nonetheless, "[w]hile the issue of

---

false swearing relating to the Policy, or engaged in fraudulent conduct relating to the Policy. (*See* Doc. 104, at 129.)

[7] To the extent Erie contends that the Rausers made intentional misrepresentations that void the Policy, the Court will deny Erie's motion for summary judgment, because determining whether the Rausers made intentional misrepresentations involves credibility determinations and other questions of fact more appropriately left for resolution by a jury.

whether an insured's representations on an application are true or untrue is normally a question

of fact, a court may decide the issue where 'minds of reasonable men could reach only one

conclusion as to their truth or falsity.'" *Id.* (citing *New Hampshire Ins. Co. v. Blackjack Cove,*

*LLC*, No. 3:10-cv-607, 2014 WL 1270984, at *6 (M.D. Tenn. Mar. 26, 2014) (internal quotations

and citations omitted)).

"A misrepresentation in an application for insurance increases the insurance company's

risk of loss if it naturally and reasonably influences the judgment of the insurer in making the

contract." *Id.* at 590. Courts "may use the questions an insurance company asks on its

application to determine the types of conditions or circumstances that the insurance company

considers relevant to its risk of loss." *Lane v. Am. Gen. Life & Accident. Ins. Co.*, 252 S.W.3d

289, 296 (Tenn. Ct. App. 2007). Courts "also frequently rely on the testimony of insurance

company representatives to establish how truthful answers by the proposed insured would have

affected the amount of the premium or the company's decision to issue the policy." *Id.* "A

finding that the insurer would not have issued the policy had the truth been disclosed is

unnecessary; a showing that the insurer was denied information that it, in good faith, sought and

deemed necessary to an honest appraisal of insurability is sufficient to establish the ground for an

increased risk of loss."[8] *Smith*, 210 S.W.3d at 590.

In this case, questions of fact preclude summary judgment on Erie's declaratory judgment

actions as to some of the Rausers' alleged misrepresentations, because the questions asked on the

---

[8] Notably, Tennessee Code Annotated § 56-7-103 "does not require a 'material' increase in the
risk of loss before an insurance claim can be rejected. It is the misrepresentation that must be
material, and the statute clearly states that a misrepresentation will not be deemed material unless
it increases the risk of loss to the insurer." *Smith*, 210 S.W.3d at 590. As a result, "the correct
inquiry . . . is simply whether the misrepresentation increased the insurance company's risk of
loss." *Id.* at 590–91.

insurance application are broad and ambiguous and because there is evidence in the record suggesting that Erie had knowledge of certain facts it claims the Rausers misrepresented. Additionally, the Court will deny Erie's motion for summary judgment as to other alleged misrepresentations because the alleged misrepresentations did not occur during "the negotiation" or in "the application for" the Policy. Finally, the Court will deny Erie's motion as to other alleged misrepresentations because Erie has not demonstrated that the misrepresentation increased its risk of loss.

Erie first argues that it is entitled to void the Policy because Mr. Rauser denied contacting and soliciting quotes from other insurance agencies when he was questioned under oath in June 2019. The Rausers, however, obtained the Policy more than two years earlier. As a result, the alleged misrepresentations cannot possibly be material as to whether Mr. Rauser made intentional misrepresentations on the application for insurance or if he made misrepresentations that increased the insurer's risk of loss.[9] To the extent Erie argues that Mr. Rausers's representations after the loss void the Policy because he falsely swore "as to any matter that relates to this insurance or the subject thereof," questions of fact remain as to whether a false statement regarding pre-contract solicitation of insurance quotes "relates to" the Policy "or the subject thereof."

Erie next argues that Mr. Rauser misrepresented that no other insurance company declined to provide insurance on his insurance application. Erie's insurance application asked if any company had "declined, cancelled, or refused to renew any similar insurance?" (Doc. 104, at 234.) Mr. Rauser answered "No," even though Cincinnati Insurance Group previously

---

[9] Even if Mr. Rauser made that misrepresentation during the negotiation and application process, Erie fails to explain how the Rausers increased its risk of loss by shopping for policies with other insurers. (*See* Doc. 101, at 5–7.)

declined to provide a quote for a policy. (*Id.* at 35–38.) Declining to provide a quote for insurance coverage, however, is not necessarily equivalent to declining coverage. As a result, the question of whether Mr. Rauser's answer was a misrepresentation is a question of fact for a jury to decide.

Next, Erie argues that Mr. Rauser misrepresented the size and value of the Property. On the quote form he provided to Erie, Mr. Rauser estimated the value of the home to be $2,000,000 and estimated the size of the dwelling as approximately 8,000 square feet plus attic space. (*Id.* at 77–78, 231–232.) Erie's insurance application does not ask for the value of the Rausers' finished home; instead, it leaves a space for the applicant to fill in the "Amount of Insurance: Dwelling." (*Id*. at 234.) In this space, Mr. Rauser put $2,000,000. In his deposition, Mr. Rauser explained that, at the time he filled out the application, he was approaching $2,000,000 in costs and was seeking builder's risk insurance. (*Id*. at 70.) Although Erie may have been seeking information regarding the anticipated value of the completed home, simply providing a space for "Amount of Insurance: Dwelling" is ambiguous enough to make the question of whether Mr. Rauser misrepresented the value or the amount of insurance desired on his insurance application a question of fact.[10]

Finally, Erie argues that Mr. Rauser misrepresented the status of the home at the time he applied for insurance coverage. Although the Rausers' insurance application incorrectly states that the Rausers purchased the Property in March 2017, the application also asked "[i]f the dwelling is in the course of construction, what is the expected completion date?" (Doc. 104, at

---

[10] Erie can use the information Mr. Rauser provided to the Wall Street Journal in August 2017—namely, that it would likely cost $4,000,000 to complete is 12,000 square foot home—to argue that he misrepresented the value of the home on his insurance application, but the ambiguity of the question posed on the insurance application makes the misrepresentation inquiry a question of fact.

155.) Mr. Rauser answered "Yes." (*Id.*) Even more clear, when asked if the dwelling was currently owned and occupied as his primary residence, Mr. Rauser answered "No," and explained that it was because the house was "under construction." (*Id.*) Given Mr. Rauser's express representations in the insurance application that the home was "under construction," questions of fact remain as to whether the incorrect purchase date on the insurance application constitutes a material misrepresentation that subjected Erie to an increased risk of loss.

Accordingly, the Court will deny Erie's motion for summary judgment on its declaratory-judgment claim, because questions of fact remain as to whether the Rausers made misrepresentations that increased Erie's risk of loss.[11]

### ii. The Rausers' Claims Against Erie

#### a. Bad Faith

The Rausers have moved for summary judgment on their claim for bad-faith denial of insurance coverage against Erie, arguing that Erie has failed to pay all amounts owed under the Policy. (Doc. 103 at 31–34.) Conversely, Erie argues that the Rausers' bad-faith claim fails as a matter of law. (Doc. 101, at 12.)

Tenn. Code Ann. § 56-7-105 provides:

(a) The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the

---

[11] The Court notes, however, that if a jury determines that the Rausers made material misrepresentations during the insurance application process, especially as to the size and value of the home, those misrepresentations may, as a matter of law, increase Erie's risk of loss. Representations as to the size and value of a home are precisely the type of representations that naturally and reasonably influence the judgment of the insurer in making an insurance contract.

loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

"Accordingly, in order to recover bad faith penalties, a claimant must prove that (1) the policy of insurance has, by its terms, become due and payable, (2) a formal demand for payment was made, (3) the insured waited sixty days after making demand before filing suit, unless there was a refusal to pay prior to the expiration of the sixty days, and (4) the refusal to pay was not in good faith." *Kees v. Celtic Ins. Co.*, No. 3:02-cv-2, 2006 WL 463121, at *7 (citing *Walker v. Tenn. Farmers Mut. Ins. Co.*, 568 S.W.2d 103 (Tenn. Ct. App. 1977); *Stooksbury v. Am. Nat. Prop. & Cas. Co.*, 126 S.W.3d 505 (Tenn. Ct. App. 2003)). "The burden of proving bad faith of an insurance company is on the plaintiff." *Nelms v. Tenn. Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978) (citations omitted).

"It is well established that an insurer having exclusive control over the investigation and settlement of a claim may be held liable to its insured for an amount in excess of its policy limits if as a result of bad faith it fails to effect a settlement within the policy limits." *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006) (citing *State Auto. Ins. Co. of Columbus, Ohio v. Rowland*, 427 S.W.2d 30, 33 (Tenn. 1968)). "Bad faith refusal to settle is defined, in part, as an insurer's disregard or demonstrable indifference toward the interests of its insured. . . . Bad faith on the part of the insurer can be proved by facts that tend to show 'a willingness on the part of the insurer to gamble with the insured's money in an attempt to save its own money or any intentional disregard of the financial interests of the plaintiff in the hope of escaping full liability imposed upon it by its policy.'" *Id.* (citations omitted).

"To discharge its duty to act in good faith, an insurer must exercise ordinary care and diligence in investigating the claim and the extent of damage for which the insured may be held liable. . . . Ordinary care and diligence in investigation require the insurer to investigate the claim to such an extent that it can exercise an honest judgment regarding whether the claim should be settled. Courts must review the facts that were known to the insurer and its agents and that should have been considered in deciding whether to settle." *Id.* at 370–71 (citations omitted). "The question of an insurance company's bad faith is for the jury if from all of the evidence it appears that there is a reasonable basis for disagreement among reasonable minds as to the bad faith of the insurance company in the handling of the claim." *Id.* at 371.

Additionally, "[a]n insurance company is entitled to rely upon available defenses and refuse payment if there [are] substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a defense and the defense was made in good faith, the statute does not permit the (sic) imposing of the bad faith penalty." *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 852 (Tenn. Ct. App. 1982) (citing *Nelms*, 613 S.W.2d at 484); *see also Sowards v. Grange Mut. Cas. Co.*, No. 3:07-cv-354, 2008 WL 3164523, at *8 (M.D. Tenn. Aug. 4, 2008) ("[I]f an insurer asserts a defense in good faith, the bad faith penalty may not be imposed even if the defense is unsuccessful." (citations omitted)).

Although the Rausers offer numerous ways in which they believe Erie handled their claim in bad faith[12] (Doc. 103, at 33), the undisputed facts demonstrate that Erie is entitled to

---

[12] The Court notes, however, that the Rausers did not provide citations to the record for any of their bases for arguing that Erie acted intentionally, fraudulently, maliciously, or recklessly. (*See* Doc. 103, at 33.) It is not this Court's job to root through the record to search for facts supporting the Rausers' assertions. *See Humphrey v. Yobonta*, No. 3:19-cv-782, 2021 WL 780731, at *6 (M.D. Tenn. Mar. 1, 2021) (citations omitted) ("It is not the Court's job 'to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands.'"); *see also*

summary judgment on the Rausers' bad-faith claim because of Erie's good-faith argument that the Policy is void based on the Rausers' alleged misrepresentations during the application process and after the loss. As the Court explained in denying Erie's motion for summary judgment on its declaratory-judgment claim, there is a legitimate issue as to whether the Rausers made misrepresentations in the insurance-application process and whether those misrepresentations increased Erie's risk of loss. If the Policy is voided due to misrepresentation or fraud by the Rausers during the insurance-application process, Erie would not owe the Rausers the guaranteed replacement cost of their home under the Policy. As a result, even if Erie is unsuccessful in proving that the Policy is void based on the Rausers' alleged misrepresentations, the fact that it asserted the defense in good faith precludes a finding of bad-faith failure to pay. Accordingly, Erie's motion for summary judgment will be granted and the Rausers' motion for summary judgment will be denied with respect to the Rausers' bad-faith claim.

b.    The Rausers' Breach-of-Contract Claim

The Rausers next argue that they are entitled to summary judgment on their breach-of-contract claim against Erie, asserting that "[t]he Policy is a valid, albeit grossly flawed, contract between the Rausers and Erie which is supported by valid consideration." (Doc. 103, at 28.)

"The basic elements of a breach of contract case under Tennessee law must include (1) the existence of an enforceable contract, (2) breach of the contract, and (3) damages which flow from the breach." *Life Care Ctrs. of Am. v. Charles Town Assocs. Ltd.*, 79 F.3d 496, 514 (6th Cir. 1996). "Insurance contracts are 'subject to the same rules of construction as contracts

_____

*Emerson v. Norvartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record).

generally,' and in the absence of fraud or mistake, the contractual terms 'should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.'" *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012) (citations omitted).

In this case, the Court has determined that issues of fact remain as to whether the Policy is void based on alleged misrepresentations the Rausers made during the application process. Resolution of that issue bears on whether there is an enforceable contract between the parties and precludes granting summary judgment for the Rausers on their breach-of-contract claim, even though the Policy provides for payment of guaranteed replacement cost and even though the Rausers timely paid their premiums and timely reported their loss. Accordingly, the Rausers' motion for summary judgment on their breach-of-contract claim against Erie is denied.

      <u>c.</u>     <u>Estoppel Due to Negligence</u>

The Rausers next argue that Erie is estopped from denying coverage for the guaranteed replacement cost based on its own negligence and the negligence of Hitson, acting as its agent. (Doc. 103, at 34–37.) As evidence of negligence, the Rausers point to Ms. Self's assurances that the home would be insured both during and after construction because the Policy would transition from a builders' risk policy into a homeowners' policy and her promise that an inspection would be performed to determine the value of the completed residence. (*Id.*)

"[A]n insurance company is generally estopped to deny any liability on any matter arising out of fraud, misconduct or negligence of an agent of the company." *Campbell v. Equitable Life Assurance Soc'y*, No. 94-5126, 1995 WL 478716, at *2 (6th Cir. Aug. 10, 1995) (citing *Bill Brown Constr. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 7 (Tenn. 1991)) (partial citations omitted). "[T]he burden of proof . . . falls on the insured to prove that a

misrepresentation was made and that the insured reasonably relied upon that misrepresentation."
*Bill Brown*, 818 S.W.2d at 13.

The Tennessee Supreme Court has held that where an insured "instructed his insurance agent to make a change in the insured's insurance coverage, and the agent made a mistake in carrying out the instruction . . . it is the insurer who must bear the consequences for the loss, not the insured. To hold otherwise would ignore the facts and well-settled law and allow an insurance agent or company to err at will without any consequences . . . ." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 522 (Tenn. 2012). Further, "[i]t would seem to be the clear duty of the insurer, professing to draw an instrument protecting the applicant's property against certain defined perils, to exercise due diligence to supply a policy which will effect the purpose intended. Any damage caused to the applicant through the agent's mistakes or negligence in making inquiries that he should know to be pertinent should rest on the insurer." *Tarrant*, 363 S.W.3d at 520 (citing *Vulcan Life & Accident. Ins. Co.*, 391 S.W.2d 393, 397 (Tenn. 1965)).

Conversely, however, the Tennessee Court of Appeals has declined to find estoppel was warranted when the insured completed a written application for insurance as a prerequisite to the issuance of insurance, the insured signed the application, and the application contained misrepresentations that increased the insurance company's risk of loss. *See Hamlin v. Allstate Ins. Co.*, No. 03A1-9211-CV-00406, 1993 WL 191988, at *4–5 (Tenn. Ct. App. June 8, 1993); *see also McPherson v. Fortis Ins. Co.*, No. M2003-00485-COA-R3-CV, 2004 WL 1123529, at *6 (Tenn. Ct. App. Jan. 12, 2004) ("An insurer is entitled to rescind coverage for misrepresentations that increase its risk of loss regardless of whether the agent played a role in the misrepresentation."). Whether the Rausers made misrepresentations that increased Erie's risk of loss therefore bears on whether Erie should be estopped from denying coverage based on

its own negligence. Accordingly, the Court will deny the Rausers' motion for summary

judgment on their claim for estoppel by negligence against Erie.

d.     Reformation of the Contract

The Rausers next argue that the Court should reform the Policy to reflect the parties'

intentions in entering the insurance contract. "[I]t is well settled that the courts have the power

to alter the terms of a written contract where, at the time it was executed, both parties were

operating under a mutual mistake of fact or law regarding a basic assumption underlying the

bargain." *Sikora v. Vanderploeg*, 212 S.W.3d 277, 286 (Tenn. Ct. App. 2006) (citing *Alexander

v. Shapard*, 240 S.W. 287, 291–94 (Tenn. 1922)). "Under Tennessee law, a contract of

insurance may be reformed only upon clear and cogent evidence of fraud or of a mutual mistake

in the drafting of the policy which renders the terms of the policy different from those agreed

upon by the parties. *Afr. Trading Int'l, Inc. v. Fireman's Fund Ins. Co.*, 583 S.W.2d 607, 610

(Tenn. Ct. App. 1979) (citations omitted).

> An important subcategory of mistake is mistake in the expression, or integration,
> of the agreement. A mistake in expression occurs where one or both parties to a
> written contract erroneously believe that the contract embodies the agreement that
> both parties intended it to express. In such cases, the courts may adjust the
> provisions of the written contract to make it express the true agreement reached
> by the parties.
>
> In order to obtain reformation on the basis of mistake in expression, a party must
> present clear and convincing evidence that: (1) the parties reached a prior
> agreement regarding some aspect of the bargain; (2) they intended the prior
> agreement to be included in the written contract; (3) the written contract
> materially differs from the prior agreement; and (4) the variation between the
> prior agreement and the written contract is not the result of gross negligence on
> the part of the party seeking reformation. Reformation is not automatically barred
> simply because one of the parties denies that there was an antecedent agreement
> or claims that the mistake was not mutual.
>
> As long as the party seeking reformation establishes the elements of a mistake in
> expression, any discrepancy between the parties' prior agreement and their
> written contract is presumed to be the result of a mutual mistake (unless, of
> course, there is evidence of fraud).

21

*Sikora*, 212 S.W.3d at 287–88 (citations omitted).

The Rausers ask that the Policy be "reformed to include full replacement cost coverage for the actual replacement cost of the dwelling on the [Property], its contents and valuables, and certain exterior elements, such as landscaping and equipment fixtures . . . ." (Doc. 97, at 33–34.) The plain terms of the Policy, however, provide the Rausers with guaranteed replacement cost as defined within the Policy. As a result, it is unclear how the express language of the Policy materially differs from the alleged prior agreement the Rausers seek to enforce. Additionally, even if reformation of the Policy is an available remedy, the Court cannot reform the Policy in the event that it is void for the Rausers' misrepresentations that increased Erie's risk of loss. Accordingly, the Court will deny the Rausers' motion for summary judgment to reform the insurance contract.[13]

> e.     The Rausers' Punitive-Damages Claim

Erie and the Rausers have both moved for summary judgment on the Rausers' punitive-damages claim. (Doc. 101, at 16–20; Doc. 103, at 30–31.) Punitive damages may be awarded in "egregious" cases involving breach of contract or tort where, in addition to showing that the defendant breached, the plaintiff provides "clear and convincing proof that the defendant has

---

[13] To the extent Erie argues that the Rausers were grossly negligent in failing to read the Policy after it was issued, the Court notes that, "[a]lthough courts have stated that the mistake must not be due to the complainant's own negligence, 'reformation is denied only in "extreme cases" where a party's fault 'amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.' Mere inattention, as the word is used in common parlance, is not an absolute bar to reformation under Tennessee law. Often times, a party could have avoided the mistake by exercising reasonable care, and if mere negligence barred recovery, the availability of relief for mutual mistake would be severely circumscribed." *Tenn. State Bank v. Mashek*, 616 S.W.3d 777, 802–803 (Tenn. Ct. App. 2020) (citing *Hunt v. Twisdale*, No. M2006-01870-COA-R3-CV, 2007 WL 2827051, at *7 (Tenn. Ct. App. Sept. 28, 2007)). However, the parties have not adequately briefed the issue of whether the Rausers' failure to read the policy constitutes gross negligence sufficient to bar reformation, and the Court declines to reach a conclusion on this point in light of the disputes of material fact relating to the parties' intended prior agreement.

acted either 'intentionally, fraudulently, maliciously, or recklessly.'" *Lindenberg v. Jackson Nat'l. Life Ins. Co.*, 912 F.3d 348, 362 (6th Cir. 2018) (citing *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012)); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901. (Tenn. 1992).

"A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Hodges*, 833 S.W.2d at 901. "[B]ecause punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence." *Id.*

Issues of fact preclude entry of summary judgment on the Rausers' punitive-damages claim against Erie. If Mr. Rauser made misrepresentations during the application process that increased Erie's risk of loss and voided the Policy, then Erie's denial of insurance coverage cannot qualify as the type of intentional, fraudulent, malicious, or reckless conduct necessary to support a punitive damages award.[14] Additionally, evidence that the Rausers failed to comply

---

[14] In fact, many of the arguments asserted by the Rausers likely will not support a punitive-damages award given Erie's good-faith argument that the Policy is void based on the Rausers' alleged misrepresentations during the application process. Erie's good-faith argument that the

with the Policy's requirement that they notify Erie of improvements or additions that increased the replacement cost of the home also cuts against the Rausers' argument that Erie fraudulently, maliciously, or recklessly denied coverage. Conversely, however, if a jury determines that Mr. Rauser did not make misrepresentations during the application process, then it could conclude that evidence that Erie denied coverage after failing to conduct inspections consistent with their underwriting guidelines constitutes reckless conduct that supports an award of punitive damages. Accordingly, both parties' motions for summary judgment on the Rausers' claim for punitive damages will be denied.

### iii. The Rausers' Claims Against Hitson

The Rausers have asserted third-party claims against Hitson for breach of their contract to procure an appropriate insurance policy, failure to procure, negligence, negligent misrepresentation, tortious failure to procure, and breach of fiduciary duty. (Doc. 97, at 36–44.) The Rausers and Hitson have filed cross-motions for summary judgment on these claims. (Docs. 98, 102.)

### a. Breach of Contract and Failure to Procure (Breach of Contract and Tort)

The Rausers assert that Hitson breached its duty to procure an "appropriate insurance policy that would adequately and properly insure the actual replacement cost of the Rausers' new

---

Policy is void likely precludes a finding that the Rausers can demonstrate by clear and convincing evidence that Erie acted intentionally, fraudulently, maliciously, or recklessly in: (1) "fail[ing] to effectuate a prompt and fair settlement of the Rausers' claim when liability was clear"; (2) "refus[ing] and [fail]ing to conduct a reasonable, prompt, and fair investigation concerning the issues surrounding the Rausers' claim for insurance proceeds"; (3) "unjustly refus[ing] . . . to pay the Rausers' full claim for its own financial preservation with no reasonable or justifiable basis"; (4) "ignor[ing] the Rausers' claim for no valid reason whatsoever"; (5) "fail[ing] to treat the Rausers' interests with equal regard to its own"; (6) "fail[ing] and refus[ing] to pay the Rausers' valid claim"; (7) "fail[ing] to provide sufficient explanation for it delay and refusal to promptly pay the claim in accordance with the Policy." (*See* Doc. 130, at 33.)

home . . . and once procured, to timely and properly service that insuring agreement, and it accepted premiums in exchange for those binding commitments." (Doc. 103, at 42.)[15] Hitson has moved for summary judgment on the Rausers' failure-to-procure claims, arguing, among other things, that they accepted the terms of the Policy. (Doc. 99, at 9–12, 17–18.) The Rausers have cross-moved for summary judgment, arguing that the undisputed evidence demonstrates that Hitson failed to procure the insurance policy requested by Mr. Rauser. (Doc. 103, at 42–43.)

"Under Tennessee law, a cause of action for failure to procure insurance is separate and distinct from any cause of action against an insurer, and the agent, rather than the insurance company, is independently liable." *Atl. Cas. Ins. Co. v. Norton*, No. 3:12-CV-650-PLR-HBG, 2015 WL 1293666, at *4 (E.D. Tenn. Mar. 23, 2015) (citing *Morrison v. Allen*, 338 S.W.3d 417 (Tenn. 2011)). "The Tennessee Supreme Court has explained that such a claim may sound in negligence or breach of contract." *Littleton v. TIS Ins. Serv., Inc.*, No. E2018-477-COA-R3-CV,

---

[15] The Rausers' breach-of-contract claim against Hitson states that "Hitson agreed to procure for the Rausers appropriate and adequate insurance coverage in a fashion that would fully indemnify the Rausers for the full replacement cost value of the Insured Premises and the contents and various appurtenant exterior elements," and that "Hitson's failure to procure the appropriate type and limits of insurance and the level of service contracted for (i.e., failure to appropriately and adequately insure the actual replacement cost of the Rausers' new home, various appurtenant exterior elements of the Insured Premises, and the contents of the home) is a material breach of the contract" for which Hitson is liable to Plaintiffs. (Doc. 97, at 37). Almost identically, the Rausers' failure to procure claim alleges that "Hitson, through its employees and agents Bryan and/or Self, entered into an agreement with the Rausers to procure an appropriate insurance policy that would adequately and properly insure the actual replacement cost of the Rausers' new home, various appurtenant exterior elements of the Insured Premises, and the contents of their home," but that "Hitson failed to use reasonable diligence in attempting to place the Rauser's requested insurance and/or failed to notify the Rausers promptly of any such failure." (Doc. 97, at 38.) Under Tennessee law, failure-to-procure claims may sound in tort or contract. *Littleton v. TIS Ins. Serv., Inc.*, No. E2018-477-COA-R3-CV, 2019 WL 141517, at *3 (Tenn. Ct. App. Jan. 9, 2019). Accordingly, the Court will analyze Count I (breach of contract) and Count II (failure to procure) together, since the Rausers' breach-of-contract claim concerns Hitson's alleged failure to procure adequate insurance for the Rausers.

2019 WL 141517, at *3 (Tenn. Ct. App. Jan. 9, 2019). The Court must determine whether a Plaintiff's failure-to-procure claim sounds in contract or professional negligence. *See Morrison*, 338 S.W.3d at 426 (Tenn. 2011). The elements of a failure-to-procure claim under a breach-of-contract theory are: (1) an undertaking or agreement by the agent or broker to procure insurance; (2) the agent's or broker's failure to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly of any such failure; and (3) the agent's or broker's actions warranted the client's assumption that he or she was properly insured. *Morrison*, 338 S.W.3d at 426 ("While other jurisdictions and secondary authority generally recognize that a failure to procure claim may be based on either negligence or breach of contract, we limit our discussion in this case to the latter." (citations omitted)). A failure-to-procure claim based upon a negligence theory requires proof of the standard elements of negligence: duty, breach, causation, and damages. *Littleton*, 2019 WL 141517, at *3 (citing *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)).

In Tennessee, paying insurance premiums creates a rebuttable presumption that the coverage provided by the insurer has been accepted by all insureds under the contract. Tenn. Code Ann. § 56-7-135. Specifically, Tennessee Code Annotated § 56-7-135 provides:

> (a) The signature of an applicant for or party to an insurance contract on an application, amendment, or other document stating the type, amount, or terms and conditions of coverage, shall create a rebuttable presumption that the statement provided by the person bind all insureds under the contract and that the person signing such document has read, understands, and accepts the contents of such document.
>
> (b) The payment of premium for an insurance contract, or amendment thereto, by an insured shall create a rebuttable presumption that the coverage provided has been accepted by all insureds under the contract.

In situations where the rebuttable presumption is triggered, claims for failure to procure insurance contracts with requested terms fail unless the insured provides evidence suggesting

that he or she did not actually accept the coverage provided. *See Parveen v. ACG S. Ins. Agency, LLC*, 613 S.W.3d 113 (Tenn. 2020); *see also Harris v. Nationwide Mut. Fire Ins. Co.*, 92 F. Supp. 3d 736, 747 (M.D. Tenn. 2015).

In *Parveen*, the insured plaintiff alleged that when he met with his insurance agent, he provided the agent with a copy of his insurance policy from Georgia and said he wanted the exact same coverage in Tennessee. 614 S.W.3d at 115. The agent then generated a quote for a policy that did not contain uninsured motorist coverage, despite its inclusion in the plaintiff's former Georgia policy. *Id.* at 115–16. The plaintiff purchased the policy, paid the premiums, and renewed the policy twice before an insured under the plaintiff's policy was involved in a motor-vehicle accident with an underinsured driver. *Id.* at 116. The plaintiff sued the insurance agent for negligent failure to procure, and the Tennessee Supreme Court affirmed the trial court's grant of summary judgment in favor of the insurance agent, finding that the insureds failed to rebut the statutory presumption triggered by the payment of premiums and were presumed to have accepted the coverage pursuant to Tennessee Code Annotated § 56-7-135(b). *Id.* at 118–22.

Like the insured in *Parveen*, the Rausers do not dispute that they signed the Policy and paid the premiums owed on the Policy. (*See* Doc. 97, at 13; Doc. 104, at 156.) As a result, a rebuttable presumption exists that the Rausers accepted the coverage set forth in the Policy, and the Rausers have not identified any evidence suggesting that they did not in fact accept the coverage provided under the Policy.[16] The Rausers' claims for failure to procure insurance,

---

[16] The Rausers' citation to *Allmerica Fin. Benefit. Ins. Co. v. Eagle Sales Co.* is unavailing to show they have rebutted the presumption. No. 2:17-cv-2545, 2021 WL 140810 (W.D. Tenn. Jan. 14, 2021). In *Allmerica*, the court considered whether an exclusion from coverage within the insureds' Policy was mutually assented to by the parties, which impacted the enforceability of the insurance contract, and the court there did not analyze a failure-to-procure claim. *Id.* The

whether sounding in contract or tort, therefore fail as a matter of law. Accordingly, the Court

will grant Hitson's motion for summary judgment on the Rausers' failure-to-procure claims and

will deny the Rausers' motion for summary judgment.[17]

> ### b. Negligent Misrepresentation

Hitson has moved for summary judgment on the Rausers' negligent-misrepresentation

claim, arguing that there is insufficient evidence in the record to suggest that the Rausers

reasonably relied on alleged misrepresentations made by Hitson. (Doc. 99, at 18–19.) The

Rausers argue that the undisputed evidence demonstrates that they have established their

negligent-misrepresentation claim against Hitson. (Doc. 103, at 44–50.)

"[T]o prevail in a suit for negligent misrepresentation, the plaintiffs must establish by a

preponderance of the evidence that the defendant supplied information to the plaintiff; the

information was false; the defendant did not exercise reasonable care in obtaining or

communicating the information and the plaintiffs justifiably relied on the information." *Williams*

*v. Berube & Assocs.*, 26 S.W.3d 640, 644 (Tenn. 2000) (citations omitted); *see also Robinson v.*

*Omer*, 952 S.W.2d 423, 427 (Tenn. 1997) (explaining that, in the context of a negligent-

misrepresentation claim against a professional, the plaintiff must establish: (1) the defendant was

---

court found that the insureds had rebutted the presumption that they accepted the exclusion
where no insured signed a required endorsement accepting the coverage exclusion. *Id.* In
addition to the unsigned endorsement, the insureds relied on representations from the insurance
company's agent promising that the exclusion did not apply. *Id.* at *7. Here, there is no written
indication that the Rausers did not accept or sign off on all terms of the Policy. *Allmerica* does
not address the situation at hand, where the insured relied on the agent's representations alone to
rebut the presumption that they accepted coverage despite having signed an application for
insurance and paid premiums on the Policy for years.

[17] Because the Court finds that the Rausers cannot recover for failure to procure, it will not
consider arguments related to whether the parties reached mutual assent in forming of the Policy,
Hitson's reasonableness in procuring coverage for the Rausers, or whether the Rausers were
entitled to assume that the Policy provided an unknown amount of coverage beyond $2,000,000.

acting in the course of his business; (2) the defendant supplied faulty information meant to guide

others in their business transactions; (3) the defendant failed to exercise reasonable care in

obtaining or communicating the information; and (4) the plaintiff justifiably relied on the

information). "An essential requirement of any action for fraud, deceit, failure to disclose or

negligent or innocent misrepresentations is detrimental reliance on a false premise." *Williams*,

26 S.W.3d at 645 (citations omitted). Detrimental reliance is an essential element of a negligent

misrepresentation claim. "In an insurance case, the burden of proof is on the insured to prove

that a misrepresentation was made and that the insured reasonably relied upon the

representation." *Id.* (citations omitted). "Liability for negligent misrepresentation will result, if

defendant is acting in course of his business, profession, or employment, or in transaction in

which he has pecuniary interest, and defendant supplies faulty information meant to guide others

in their business transactions, defendant fails to exercise reasonable care in obtaining or

communicating information, and plaintiff justifiably relies upon information." *Id.* at 644 (citing

*Robinson*, 952 S.W.2d at 427).

"In considering whether reliance on a misrepresentation was reasonable, a court should

consider: (1) 'the plaintiff's sophistication and expertise in the subject matter of the

representation,' (2) 'the type of relationship—fiduciary or otherwise—between the parties,' (3)

'the availability of relevant information about the representation,' (4) 'any concealment of the

misrepresentation,' (5) 'any opportunity to discover the misrepresentation,' (6) 'which party

initiated the transaction,' and (7) 'the specificity of the misrepresentation.'" *CMH Mfg. v. GKD

Mgmt., LP*, No. 3:18-cv-519, 2019 WL 10980481, at *10 (E.D. Tenn. Dec. 10, 2019) (citing

*Davis v. McGuigan*, 325 S.W.3d 149, 158 (Tenn. 2010)). "The law of misrepresentation requires

a fact-finder to take into account the specific situation of a plaintiff in evaluating the

reasonableness of reliance," and "whether a plaintiff's reliance on alleged misstatements is reasonable is [] generally a question of fact inappropriate for summary judgment." *City State Bank v. Dean Witter Reynolds*, 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996).

In this case, issues of fact regarding whether the Rausers justifiably relied on misrepresentations made by Hitson preclude the grant of summary judgment for either party. According to Mr. Rauser, he contacted Hitson to obtain builders' risk insurance coverage, and Ms. Self represented that the home would be inspected upon completion to determine its value. (Doc 104, at 52–53.) Issues of fact remain regarding whether Mr. Rauser justifiably relied on Ms. Self's alleged misrepresentation given the terms of the Policy, which Mr. Rauser admits to not reading, including the provision that the Rausers were under an obligation to advise Erie of any improvements exceeding $5,000. A reasonable jury could conclude that this Policy provision put Mr. Rauser on notice that he had affirmative obligations regarding disclosure of the home's value and that it was unreasonable for him to assume that only a home inspection upon completion would establish the value of the home for the purpose of arranging for an adequate level of coverage. Accordingly, the Court will deny both the Rausers' and Hitson's motions for summary judgment on the Rausers' negligent-misrepresentation claim.

    c.    <u>Negligence</u>

The Rausers have also moved for summary judgment on their negligence claim against Hitson.[18] (Doc. 103, at 44–51.) To establish a claim for negligence, a plaintiff must establish (1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause. *Morrison*, 338 S.W.3d at 437 (citations omitted). "'Where the evidence of the

---

[18] Hitson did not move for summary judgment on the Rausers' negligence claim. (*See* Doc. 99.)

parties conflicts, or where that evidence reasonably leads to different conclusions, negligence issues, specifically questions of ordinary care and proximate cause, are questions for a jury.' Accordingly, the Tennessee Supreme Court has noted, '[a]s a general rule summary judgments are not appropriate in negligence cases.'" *Burnett v. Sonya Express, Inc.*, No. 3:07-cv-489, 2009 WL 159688, at *6, (M.D. Tenn. Jan. 22, 2009) (citations omitted).

"At a minimum, an agent has a duty to act in accordance with the express and implied terms of any contract between the agent and the principal [] and to faithfully carry out the instructions of his or her client. 'Subject to any agreement with the principal, an agent has a duty to the principal to act with the care, competence, and diligence normally exercised by [insurance] agents in similar circumstances.' Thus, if an agent undertakes to perform services as a practitioner of a trade or profession, the agent '"is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities" unless the agent represents that the agent possesses greater or lesser skill.'" *Morrison*, 338 S.W.3d at 450. Further, "an insurance agent employed to maintain insurance coverage for a client may be held liable on a negligence theory if the agent fails to use reasonable care and diligence in continuing the insurance, either by obtaining a renewal or replacement policy or by properly maintaining an existing policy." *Wood v. Newman, Hayes & Dixon Ins. Agency*, 905 S.W.2d 559, 562 (Tenn. 1995).

The Court finds that genuine issues of material fact exist as to whether the Rausers have suffered harm as a result of Hitson's allegedly negligent acts. At a minimum, a jury could conclude that Mr. Rauser did not misrepresent any facts in his insurance application and determine that, without Hitson's alleged negligence, the Rausers would have received the replacement coverage from Erie that they allegedly sought. However, if a jury concludes that the

Rausers are entitled to payment for the full replacement cost from Erie under the Policy, then the Rausers will have suffered no damages from Hitson's alleged negligence. As a result, until a determination on the validity of the Policy is made, and until a determination is made as to whether Erie breached the Policy, it is impossible to know whether Hitson's failure to conduct an inspection of the Rausers' home was negligent and caused the Rausers harm. Accordingly, summary judgment on the issue of negligence will be denied.[19]

### d. Breach of Fiduciary Duty

"A fiduciary relationship arises when one person reposes special trust and confidence in another person and that other person — the fiduciary — undertakes to assume responsibility for the affairs of the other party. The person upon whom the trust and confidence is imposed is under a duty to act for and to give advice for the benefit of the other person on matters within the scope of the relationship. Proof of damages is an essential element of a fiduciary duty claim, as is causation of damages." *Morrison v. Allen*, 338 S.W.3d at 437–38 (internal quotations omitted). The disputes of material fact relevant to the Rausers' claims for negligence and negligent misrepresentation also preclude summary judgment on the Rausers' breach-of-fiduciary-duty claim. Accordingly, summary judgment on breach of fiduciary duty will be denied as to both parties.

---

[19] It is undisputed that Hitson was a party to an Agency Agreement with Erie and that Hitson acted as the agent of Erie. (Doc. 104, at 325, 414–15.) The Rausers argue that Erie should therefore be held vicariously liable for any negligence on the part of Hitson. (Doc. 103, at 37.) As discussed herein, issues of a fact preclude entry of summary judgment on the Rausers' tort claims against Hitson. Accordingly, the Court cannot determine whether any of Hitson's acts of alleged negligence are attributable to Erie.

## III.  ERIE'S MOTION TO EXCLUDE MARTIN AND BLALOCK

### A.  Standard of Law

Federal Rule of Evidence 702 governs the admissibility of testimony by expert witnesses and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 588–95 (1993) (construing Rule 702).  However, "the Rule 702 inquiry is 'a flexible one.'  *Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.'  And *Daubert* adds that the gatekeeping inquiry must be "'tied to the facts'" of a particular 'case.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal citations omitted).  The Sixth Circuit has identified three requirements for an expert's testimony to be admissible under Rule 702:  (1) "the witness must be qualified by knowledge, skill, experience, training, or education"; (2) "the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue"; and (3) "the testimony must be reliable."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

With respect to the first requirement, courts consider whether the expert's qualifications "provide a foundation for a witness to answer a specific question," as opposed to considering his or her qualifications in the abstract.  *Burgett v. Troy-Bilt, LLC*, 579 F. App'x 372, 376 (6th Cir.

2014) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The party offering the expert testimony must prove the expert's qualifications by a preponderance of the evidence. *Id.* (citing *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008)).

To determine whether the second requirement of relevance is met, a court must, as a preliminary matter, consider whether the proffered expert testimony is relevant under Rule 401, which provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Daubert*, 509 U.S. at 591–92 (1993) (citing Fed. R. Evid. 401(a)). The testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue . . . . Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (internal quotations marks and citations omitted). In addition to relevance as defined in Rule 401, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. This aspect of the relevance requirement—described in *Daubert* as "fit"—concerns whether the method on which the testimony is based is scientifically valid for the "pertinent inquiry" in the case. *Id.*  !

Reliability, the third requirement, is assessed by the factors set out in Rule 702 itself— whether the testimony is based on sufficient facts or data, whether the testimony is the product of reliable principles and methods, and whether the principles and methods used were reliably applied. *In re Scrap Metal*, 527 F.3d at 529 (citing Fed. R. Evid. 702). To be reliable, an expert's testimony must be supported by "'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 595). A reliable expert opinion also "rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529–30. Courts "generally permit testimony based on allegedly erroneous facts when there is some support for those facts in

the record." *Id.* at 530. Thus, reliability—distinct from "credibility and accuracy"—focuses on the methodology employed rather than the conclusions drawn. *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *In re Scrap Metal*, 527 F.3d at 529); *see also Daubert*, 509 U.S. at 595.

"[R]ejection of expert testimony is the exception rather than the rule," *In re Scrap Metal*, 527 F.3d at 530, and "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact," *Burgett*, 579 F. App'x at 376 (quoting *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998)). "A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel." *Id.* at 376–77; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

A district court may, but need not, hold an evidentiary hearing to aid in the decision of whether to admit expert testimony. *See Kuhmo*, 526 U.S. at 152.

### B. Analysis

#### i. Daryll Martin

The Rausers have disclosed Daryll Martin as an expert on, among other things, insurance underwriting and claims.[20] In his report, Martin opines, among other things, that: (1) under the terms of the Policy, Erie is not permitted to deny coverage and the Rausers are entitled to guaranteed replacement cost coverage; (2) Erie and the Bryan Agency failed to meet the industry standard of care by failing to act prudently and with appropriate diligence; (3) Erie's

---

[20] In a footnote to Erie's motion to exclude Martin's testimony, it represents that "Mr. Martin has been offered as an expert on other topics as well; however, this motion only focuses on the areas of his alleged expertise that pertain to Erie, namely underwriting and claims." (Doc. 89, at 3.)

homeowner's policy was not a suitable replacement for the builder's risk policy the Rausers initially required; (4) Erie failed to comply with numerous policies, practices, and procedures set forth in its own guidelines and manuals, which resulted in it failing "to meet the standard of care established by these prescriptive processes, as well as the industry established standard of care; and (5) Erie's conduct in adjusting the Rausers' loss was improper because it failed to "fully analyze the policy provision it relied upon in denying guaranteed replacement cost coverage." (Doc. 89-1, at 4–5.)  Erie moves to exclude Martin's opinions regarding "underwriting and claims," arguing that he:  (1) is not qualified to opine on insurance underwriting and his opinions on underwriting are unreliable; (2) is not qualified to opine on insurance claim handling and adjustment; and (3) fails to identify an applicable standard of care or explain how Erie breached a standard of care it owed the Rausers.  (Doc. 89, at 3–9.)

Martin has over thirty years of experience in the insurance industry, including as corporate counsel to regional, national, and international insurance brokers.  (Doc. 89-1, at 2–4.) According to his report, as corporate counsel, he oversaw professional-liability disputes and resolved coverage disagreements involving insureds, agents, brokers, and insurance companies. (*Id.*)  Martin represents that his role as counsel made him aware of "insurance company customs and practices related to underwriting practices and guidelines and claims practices of numerous insurers throughout the country," including litigation based on bad-faith and unfair-claim practices.  (*Id.*)  According to Martin, he also managed claims and litigation against the underwriting facilities owned by one of his employers, including disputes over "property underwriting related to whether coverage had been properly underwritten in compliance with the subsidiary company's . . . or insurer's . . . underwriting guidelines, procedures, as well as industry practices."  (*Id.* at 3.)

Martin's experience in the insurance industry, however, is primarily in brokering insurance contracts, litigation management, and general management of insurance companies, and he has little relevant experience in underwriting or adjusting claims. (*See* Doc. 89-1, at 1–3, 58–61; Doc. 89-3, at 3–50.) For example, when describing his work at Alexander & Alexander, Martin testified that "during my time there, it included handling regulatory issues, professional liability claims issues, some minor mergers and acquisitions work and contract work" and "commercial litigation management," which included "some subpoena response in house," "tak[ing] the claim in, understand[ing] what it was about, interview[ing] witnesses, strategiz[ing], [and] creat[ing] the defense strategy." (Doc. 89-3, at 3–5.) As President of Sedgwick's Nashville office, Martin "was charged with hiring salespeople," "managing all the people in the office," and "charged with maintaining business and growing the book of business." (*Id.* at 11.) In describing his work at Allstate between 2010 and 2012, Martin testified that he "had underwriting authority" as "an agent," but eventually conceded that he acted primarily as an agent, not an underwriter:

> Q.   Okay. When you say you had underwriting authority, what does that mean?
>
> A.   It means I had the authority to bind coverage.
>
>       . . .
>
> Q.   Were you acting as an agent or an underwriter?
>
> A.   Both.
>
> Q.   Both. In other words, an agent is what they call a field underwriter, but what you were doing is you were acting as an agent and you're using – small you. You were also kind of underwriting because you were asking questions and things of that nature, correct?
>
> A.   No different than the way Erie perceives its agent, I was acting as a field underwriter.

Q.     Okay.  But you were not such as . . . the other three people that testified in this case, underwriters from Erie, you have never been an underwriter with the label of underwriter such as, let's see, Nicki Shields and Mark and the other lady.  You have never been –

A.     That's correct.

(*Id*. at 55–56.)  Martin has never worked as an underwriter at an insurance company and has never underwritten an insurance policy.  (Doc. 89-3, at 56; *see also* Doc. 89-5, at 4–7; Doc. 89-4 at 2–4.)  Additionally, although he previously claimed to have supervised underwriters, he conceded that his responsibilities did not include approving underwriting decisions or decisions related to whether to accept risks.  (Doc. 89-4, at  2–4.)  Similarly, Martin's prior testimony suggests that he has little experience adjusting insurance claims.  (Doc. 89-1, at 1–3; Doc. 89-3, at 51–52.)  For example, when describing his work at Aon, Martin testified:

"I was not responsible for claims.  I had a claims consulting operation that I was primarily charged with getting new clients, servicing the clients we had, managing a risk management practice which included actuaries, data – data crunchers, . . . risk control people, and a bunch of account executives and account managers that would manage the day-to-day operations on those accounts."

(Doc. 89-3, at 13–14.)  Regarding his experience as an insurance adjuster, Martin also testified:

Q.     Okay.  I noticed you worked for State Farm in the early '80s.  That was the last time you worked as an adjustor.

A.     That was the last time I worked as an adjustor, but throughout my experience at A&A, Alexander & Alexander, and Sedgwick, one of my principal clients were their TPAs, which were, at the time the largest in the county.

Q.     What is 'TPAs'?

A.     Third-party administrators where they would act on behalf of insurance companies.

Q.     Okay.  But you weren't doing that, though, were you?  You weren't an adjustor or anything of that nature at that time?

A.     I was not a licensed adjustor.

(*Id*. at 49–50.)

Although Martin has significant experience in the insurance industry generally, he is unqualified to provide helpful testimony regarding underwriting insurance policies and adjusting insurance claims given his lack of experience in those areas. This is especially true given that at least some of his opinions regarding underwriting and adjusting—like his opinion that the Policy does not permit Erie to deny coverage and that the Rausers are entitled to guaranteed replacement cost coverage—are mere legal conclusions. *Shahid v. City of Detroit*, 889 F.2d 1543, 1548 (6th Cir. 1989) (noting that although an expert's testimony may embrace an ultimate issue, it cannot amount to a legal conclusion). Consistent with this finding, at least one district court has excluded Martin from offering opinion testimony regarding underwriting, concluding that "[i]t is clear Martin has no underwriting experience, and that his experience in the insurance industry as a broker and attorney cannot make him an expert in underwriting." *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 5:13-cv-00210, Doc. 130 (E.D.N.C. 2014). Accordingly, Erie's motion to exclude Daryll Martin's testimony (Doc. 89) will be granted to the extent it seeks to exclude his testimony regarding underwriting insurance policies and adjusting insurance claims.

### ii. Brent Blalock

The Rausers have disclosed Brent Blalock, an architect, as an expert on the cost to rebuild their home. (Doc. 89-6, at 1–2.) In his revised estimate, Blalock opines that the estimated cost of the Rausers' rebuild is $5,919,440.00. (Doc. 104, at 322.) Erie has moved to exclude Blalock, arguing he is not qualified to opine on the cost to rebuild the Rausers' home, because he is an architect, not a licensed contractor. (Doc. 89, at 9.)

Tennessee Code Annotated § 62-6-102 defines a "contractor" as "any person or entity that undertakes to, attempts to or submits a price or bid or offers to construct, supervise,

superintend, oversee, schedule, direct or in any manner assume charge of the construction, alteration, repair, improvement, movement, demolition, putting up, tearing down or furnishing labor to install material or equipment for any building . . . for which the total cost is twenty-five thousand dollars ($25,000) or more." Under Tennessee law, "[a]ny person, firm or corporation engaged in contracting in this state shall be required to submit evidence of qualification to engage in contracting, and shall be licensed as provided in this part." Tenn. Code Ann. § 62-6-103. Based on these statutes, Erie argues that Blalock is prohibited from providing an opinion regarding the reconstruction price in this case because he has "submitted a price for the rebuilding of the Rauser's residence" without a license. (Doc. 89, at 9; Doc. 105, at 4.)

The fact that Tennessee requires contractors to be licensed to submit bids to construct buildings over $25,000 does not mean that an architect, like Blalock, is unqualified to opine on the cost of rebuilding the Rausers' home.[21] Blalock has an undergraduate degree in architecture from the University of Tennessee and has worked in the construction industry for over fifty years. (Doc. 89-6, at 2.) He represents that he has been "trained in common industry techniques for construction cost estimating and [has] personally generated scores of cost estimates throughout [his] career." (Id.) Further, Blalock was "heavily involved" in estimating and construction management during the decade-plus he worked at Blalock Construction Company beginning in 1970. (Id.) He also oversaw the estimating department at Rentenbach Constructors, where he was employed for approximately a decade. (Id. at 3.) He currently runs

---

[21] To be sure, if Blalock wanted to submit a bid to actually rebuild the Rausers' home, Tennessee law would likely require him to obtain a contractor's license. But, for the purposes of the present dispute, Erie has not provided, and the Court's independent research has not revealed, any cases in which a Tennessee court has excluded an expert from testifying as to the cost of home reconstruction simply for lack of being a licensed contractor.

Blalock Consulting, where he provides "design support to area owners, architects, and engineers and litigation support in construction related disputes." (*Id.* at 4.) As it relates to this case, Blalock calculated the reconstruction cost estimate based on, among other things, architectural and engineering plans, shop drawings, interviews with the Rausers and subcontractors and suppliers to the original home construction, and photographs during construction and after the fire (*id.* at 4, 9–39), and Erie does not argue that Blalock's reconstruction estimates are unreliable or irrelevant to issues in this case (Doc. 89, at 9).

Given Blalock's education and work history and the information he provided in his report, the Court finds that the Rausers have satisfied their burden of demonstrating that Blalock possesses specialized knowledge that will assist a jury in understanding the cost of reconstructing the home. Accordingly, Erie's motion to exclude Blalock's testimony is denied.

## IV. CONCLUSION

For the foregoing reasons, Erie's motion to exclude Daryll Martin and Brent Blalock (Doc. 89) is **GRANTED IN PART** and **DENIED IN PART** and its motion for summary judgment (Doc. 102) is **GRANTED IN PART** and **DENIED IN PART**. The Rausers' claim against Erie for statutory bad faith is hereby **DISMISSED WITH PREJUDICE**. The Rausers' motion for summary judgment (Doc. 102) is **DENIED**, and Hitson's motion for summary judgment (Doc. 98) is **GRANTED IN PART** and **DENIED IN PART**. The Rausers' claims against Hitson for breach of contract and failure to procure are **DISMISSED WITH PREJUDICE**.

SO ORDERED.

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**